We have three cases under consideration this morning. Two cases have been submitted on the briefs and will be decided on the briefs. The case we have scheduled for argument this morning is B v. United States 24-2306. Mr. Clemente, you reserved three minutes of time for rebuttal, correct? Yes. Michael Clemente for Mr. B. On his fourth deployment to Afghanistan, Mr. B and his men were hit by multiple IED blasts that collapsed the building on top of them, killed two Marines, and left the rest of the crew dead. Mr. B woke up hours later in a CT scanner with serious brain injuries. And one of the key questions today is whether those injuries left him unable to perform the duties expected of an infantry Marine. Those injuries left him with serious disabilities, erratic behavior, panic-level anxiety, causing his wife to, his supervisors to tell his wife that she should hide the weapons in their home and sleep separately from him in a locked bedroom, spatial problems, difficulty using a GPS or a map, getting lost in unfamiliar surroundings, and more. The board's decision below denying medical retirement for Mr. B cannot stand for two main legal reasons. The first is that it did not apply the mandatory liberal consideration standard. Counselor, we've gone through the facts and the background of this case. Can you get right to the issue of the fitness determination? Yes, Your Honor, of course. On the fitness determination, as this court held in Kelly, and as lower courts have implemented it, that standard, there's a sole standard for determining fitness. And what the board is required to do is to relate the nature and degree of the service member's disabilities with the duties reasonably expected of their office grade, rank, and rating. And this court held in Kelly that the ability to do some other narrow assignment does not necessarily equate with the ability to perform the broader scope of duties in one's office grade, rank, or rating. And so this is one of our key legal arguments here, this and the liberal consideration argument. On this one, as Your Honor wrote in the Kelly decision, it's a duty-by-duty or a task-by-task analysis. That's how the white court, which was submitted yesterday in the 28-J letter, that's how it implemented the Kelly decision. And so the board's failure to ever do that in this case, the main error was on the fitness inquiry, it never identified the duties of an infantry unit leader in the Marine Corps. It didn't equate those duties of being an infantry man with the duties of being, let's say, the instructor to chaplains. So there was some consideration here. The board did look at his fitness reports from the time where he was on a shore tour. This is a temporary assignment he had where he was instructing Navy chaplains and medics. And it's true that the board looked at his fitness reports from that time and said that they were sufficient and showed that he could do that job. But the board never said, can he do the other jobs that are going to be expected of him in his office grade rank and rating? And we know from the Marine Corps manual. Do we have clarity on whether it's undisputed what the official duties are? Well, in terms of. Part of his position. In terms of the. The government and the board never outlined their view of what the duties are. So we don't know their actual view. Didn't the board actually say that? As I read the board's opinion, the board, when you were saying to them, you need to specify the duties. They said, no, no, no, no. That's that's your right. And that air. Well, we did. I understand that, but they're certainly in essence saying, well, you didn't define the duties well enough, so we don't have to look at it. Oh, yes. Yes, that's certainly an error, Your Honor. And let me ask this question. When looking at the duties, would you be at all inclined to look at the duties that were actually performed by Sergeant B? If I'm not mistaken, a fit rep for him while he was in Afghanistan. When he was in the same position of a leader of the platoon, right? He actually went on 20 actual patrol missions with fellow Afghans. According to the fitness report. Yes, I entirely agree with one tiny, tiny modification. Just for clarity's sake, he was promoted before discharge to an infantry unit leader position. But that position required him to maintain all the exact same capability.  So I 100% agree with you that one of the ways just to come to the overlap issue, which had come up in Kelly. Yes, I think what I read the board to be saying was here are the duties that he was assigned when he was out of garrison. He was over someplace where there are Navy doctors and nurses, and he's training them. And here are his listed duties. And then the board looked at the M.O.S. document and the training manual that you had pointed to. And they went in there and said, well, look in here. There are some duties in that manual that align. And so there's an overlap. Right. And I don't think you're disagreeing with that. You're saying that's not the question.  The question is, are there other duties outside of those delineated outside of the overlap duties that needed to be considered?  I just want to excuse me. That's just what what are the duties? So we outlined the duties in our filings. They're outlined in the Marine Corps manual, which cross-references the Marine Corps training and readiness manual. It says, in essence, it's a general description in the M.O.S. Yes. And then you go down two layers and it says, go look at the training manual.  To find out where the guts are. Right. And there it describes the duties of a, for instance, an infantry Marine. And when it lists them, it says they must be capable of full-spectrum combat. Where are you in the record? This is on Appendix 1283. 1282. Yeah, this is Appendix 1283, and this is describing the duties of a infantryman in the Marine Corps. But was that his position? I thought his position was some 0369. Yeah, so he was promoted to infantry unit leader. And that, as we cite in our brief, he was required to maintain the core and core plus capabilities of an 0300 Marine infantryman. So he still had all these same requirements. When he was promoted, he basically had additional administrative requirements. He was coordinating with command more, but he still had to keep all of these capabilities. And those capabilities include capable of the full spectrum of combat, day or night, against opposing forces. Using maneuver warfare to locate, close with, and destroy the enemy. Able to secure, defend vital terrain by repelling the enemy's assault by fire, maneuver, and close combat. Now, Mr. B, with his symptoms, is clearly unable to do those things. And I would just point out that neither the board nor the government has ever... Before you go on, I thought the questions from both of my colleagues were sort of asking, well, how do we know, how do we know what these duties are? Now, this is all very technical stuff there. For example, if you look at 81293, there are specific ballot descriptions. And I couldn't tell whether those are also pertinent. Sorry, which page did you... Page 1293 in the record. Yes, so these are the different types of positions you could have as an infantry unit leader. And what we point out in our brief is that all of these also require combat. Yes, I know that, but I mean, wouldn't they be pertinent as well? Yes. Yes. So my point is that are we, who are not trained military experts, supposed to comb through the mountains of Department of Defense Marine Corps documents and sort of try to pick out? Or are we simply in a position of saying the board, a la Kelly, failed to do this, and it's up to the board in the first instance to specify what the duties are? Well, I would say that in Kelly itself, there, the court did rely on the equivalent manual milpers for the Navy, which is an equivalent manual to this. You just seem to me like combat, either training, either active, either duty training stateside for combat, which the four veterans amicus brief pointed out is relevant and the government conceded that to be true. So, if you're talking combat seems to be core to your argument here. Yes. And so, did you below to the board say, hey, you've got less combat as one of the duties. Yes, we said you need to list the, and this is another error of the board on the fitness issue. You have to issue, and this is also setting Kelly, you have to go through the common military tasks. These are the mandatory factors when you do this. And we said that the common military tasks for infantry marine include combat. And we listed these same manuals that we cited. And so, I take the point, your honor. When you say combat, are you also referring to combat readiness or is that something separate? Well, combat readiness is also expected of an infantry marine. So, we think you can distinguish those, but both are expected. If you're an infantry marine, you're expected to be able. And that's a core duty of a rifleman or infantryman. Yes. Training for combat. Training for combat and being able and willing to participate in combat if called upon. And we also know that this wasn't expected. Did the court make a ruling on combat readiness? Did the, did it, did it, excuse me, what was the question? Was there a ruling with respect to or consideration of combat readiness? The board did not find that Mr. B was ready to engage in combat. The closest the board came was to say that Mr. B, in its view, which we disagree with, but it said that he could train marines in a garrison environment. And that's, so, that's the furthest it would go. The board never said Mr. B was ready for combat or could engage in combat. And then the claims court said the board wouldn't need to because, at least in the claims court's view, this whole question of combat readiness is just another way of looking at the question of deployability. And deployability is not a decisive fact. I think that's something to the effect of what the claims court said. Is that right? Yeah, the claims court did say something along those lines. It was, so, part of what it did, though, is it, the actual language for deployability, which, by the way, in Kelly, just by not considering deployability and the common military tasks, this court said remand was necessary just because of that error. And that error happened here. I understand that. I just want to hear your response to claims court's reasoning for how it felt like it was okay for the board to not really directly confront the combat-capable line of argument you had. Right. So the first problem, at least on the deployability issue, because its premise was deployability can't be decisive, but that's not what the regulation says. It says the inability to be deployed in every conceivable circumstance to every geographic reason will not be the sole reason to find someone unfit. Counselor, you're well into your rebuttal time. I'm going to let you continue because we obviously have more questions, but I want you to move on to liberal consideration of that issue. Yes. Can I just make one more point? Because I do think we need to spend a little more time here, and we only have one on your case today. I'm troubled by where your argument on combat is leading because it suggests to me possibly that a Sergeant B or another fine Marine who is not fit for combat must be referred into the MES system. And so if you see what I'm talking about, I mean, lots of people get injured in ways. They may lose an arm or a leg or something else, and they may not be fit for combat, but they wish to remain in the service, and they are fully capable of performing excellently necessary and important duties for the country. But the logic of your argument seems to be that any service member who is unfit for combat, there's a requirement to refer him to an MES. Well, so I take your point, and I would make two responses. One is if there's a service member who's injured and can no longer perform the duties of their office grade, rank, and rating, and it includes combat, they can be reclassified. So they could, if the military says, you know, would you like to be reclassified so that your expected duties are different, that could happen where the member could still serve. That's almost saying that we're going to put the Marine Corps, the Defense Department, through the Marine Navy and Marine Corps through a massive task of going through and determining all these fine service members who are no longer capable of combat, giving them a new rating of some sort. Well, I mean, it depends on the specifics of what the duties expected of that particular office grade, rank, and rating. So there could be different ratings that don't require combat readiness. But if it does require combat readiness and you're not combat ready, then you don't meet. Well, the problem is that all, I mean, what you've said is that even at the infantry unit leader status, Sergeant B, he nonetheless, all of his duties include that of the buck private. Yes. Well, the buck private is always going to have to do combat. Yes. That's why they sign you up. Right. And so in his case, another option would be. The military has to constantly reevaluate the Corps for possible demotions. Well, it depends. I mean, you would have to do, if you suspect someone is unfit. I'm just thinking, although, you know, your client here maybe would have wanted that. My instinct is most, you know, enlisted infantrymen wouldn't want that. And my instinct is also that they wouldn't be found unfit if they had a minor injury and they were still able to participate meaningfully in combat. If they weren't able to participate in combat and that is what's expected of them, then they would need to either be reclassified or under the binding regulations, they cannot perform the duty that's expected of them, the Corps duty that's expected of them. Now, I'd also say there's qualifying language in the regs which reasonably expected of the member. So you could imagine situations where a service member has the ability to engage in combat is very small and it's actually not the focus at all of the expected duties. And in that case, the inability to engage in combat wouldn't be reasonably expected. So there is some leeway there for those types of situations. But, Your Honor, if you had a service member whose Corps duty was to be able to engage in combat and he could no longer do it because he was injured in service, then he would have to be either reclassified or found unfit. Okay. Can you move to liberal consideration? Yes. On liberal consideration, the – Can I just ask a question for a moment? We're dealing with statute here, right? Both the statute and binding DOD memo. Well, that's true, but I mean it's the statute is the one that tells – requires as a mandatory way in H-2B that you review the liberal consideration and it's looking at whether or not liberal – whether PTSD potentially contributed to the discharge, right, circumstances of the discharge. Here, your circumstances of your discharge were entering into the VSP program. Right. So – So the board, in its opinion, looked at the reasons you gave them. You said, well, I'm going in VSP because I'm fearful that I may not be promoted. That's the reasoning in footnote 32, I think it is, right? And so I'm saying to you that doesn't have anything to do with PTSD. So a few points in response. One is the current memo independently is binding. And I know you want us to focus on the statute, but I just would flag that. On the statute itself, I would put your honor to 1552 H-1, where it says this subsection applies to a former member whose claim – I understand that, but the problem is that that's simply defining the claim. Before H-1 comes along, there is – who knows whether there's even a legitimate claim to be made that PTSD contributed to the circumstances of your discharge. And so H-1 defines that claim broadly to cover, I think, even what you're talking about. But the statute seems to narrow what it is that PC actually applies to – LC, pardon me, liberal consideration. Right. And so – You're focusing on a real discharge, what actually happened here. And your focus is on something that didn't happen that should have happened. So aren't you talking about a hypothetical discharge that you think should have been put in place? Your claim is PTSD affected you, and the government should have realized – Memory should have realized, ooh, this guy never should have even been allowed to sign up for VSP. He should have been taken out on M-A-B-P-E-B. Yep. So the government, I believe, as I read the red brief, they're saying that liberal consideration just doesn't apply to a case like yours, where the reason why you're going out is because of a voluntary desire to separate. So – I didn't see your argument. I didn't see you responding to that government's argument. Why, in your case, I mean, Doyon, even the government recognizes that Doyon falls within the statute. And so we are seeking the exact same thing that Mr. Doyon sought. So when it says review of a death mat, his discharge, he was discharged for unsuitability, and his argument is my unsuitability was triggered, the conduct was triggered by my PTSD. And the government is arguing that's a very different kettle of fish, different situation from somebody who says, well, I'm voluntary – separating voluntarily, and the reason why I'm doing that is I'm fearful I may not be promoted. Doesn't have anything to do with PTSD. In Doyon, the court said that liberal consideration applies to a record correction request. You're asking to correct the discharge record. So what's being referred to – I understand what Doyon said, but the question – the first question is whether Doyon actually decided the question in front of us, which is does liberal consideration apply to a fitness determination? And there's argument back and forth, and the judges of the court-favored claim seem to disagree about whether or not Doyon actually decided that. All the courts of claims decisions that have come out and actually decided this have all come out in our favor. There's not any court of claims that have held otherwise, that have held – I mean, the judge in this very case, Judge Hagee, said he didn't think that was decided. He didn't resolve – he said, I don't need to resolve the issue, because in his view, the board did apply liberal consideration. So he didn't issue a ruling on that. Every judge – He said we – his opinion says that Doyon reserved that issue. He said that there's an argument about that, but he doesn't need to decide it because, in any case, he thought that the board did, in fact, apply liberal consideration. But did you get to the statutory rule of concern that I heard Judge Clevenger articulate, which is that H-2B is premised on trying to figure out whether PTSD potentially contributed to the circumstances resulting in the discharge, the actual historical discharge that actually occurred. Yes. And the actual historical discharge that occurred in this case was a voluntary separation. And so – but the way you've constructed your argument is you want to propose an analysis of whether PTSD could have resulted in a medical unfitness discharge that never actually happened. And when we go back to the statute and it talks about the historical discharge, that's a different inquiry than the one that you're running in the appeal.  So in 1552, what it's talking about when it says discharge is the discharge record. In 1552H, this is all being directed to the Record Correction Board. All that they do is correct records. And when it says a claim to correct the discharge, it's the DD-214 form. And on that form, there's a box that says narrative reason for discharge. And this court held in Doyon that liberal consideration applies when you're asking to change that box on the DD-214 form. And that is what Mr. B is asking here, which is exactly what Mr. Doyon asked for. Mr. Doyon said, the narrative reason for my discharge, that's the box of my discharge. Did he actually answer that, or is that the effect? Judge Hagee said, in essence, that that is presumably what you're trying to do. You didn't make a specific request to that effect. No, we did. The specific request is for medical retirement. And what that means, the way that this board would grant that relief is by correcting the narrative reason for discharge in the DD-214 form. For Mr. B, it said personality disorder, the code for personality disorder. For Mr. Doyon, it said that. For Mr. B, it says VSP. But it's the same box. They're both trying to change the narrative reason for discharge to get medical retirement. And this court said liberal consideration plainly applies to that. It applies to a request to correct your record. What would make perhaps more sense to me is if you leaned into the phrase potentially contributed to the circumstances resulting in the discharge. And here I think you're trying to say the circumstances were that at the time when Mr. B was in service, he just was not well. And he wasn't feeling he was fit to carry on with the duties that he was officially assigned, and therefore felt like he had to voluntarily separate. And then I can understand better why that theory lines up with the language of the statute. Yes, I completely agree. The circumstances resulting in his discharge was that he had PTSD and traumatic brain injury. He was struggling in the service. It gave him a, quote, break on this short tour. But these short tours are rotational. And his was coming to an end. So he needed to make… The circumstances didn't result in the discharge. Well, but his claim is that they did. His claim, because this is about the nature of the claim, his claim is that because of his post-traumatic stress disorder and his traumatic brain injury, he left the service, and he should have been instead given medical retirement. I suppose the reason why I'm fussing with this, and I think maybe the other judges are, is because your brief contended that the plain meaning of the statute is in your favor. And by the plain meaning, it means that you look at the words and the words just line up exactly and where there's no room for debate, right? That's what plain meaning means. And so you've got to admit that when you get to potentially contributed to the circumstances of the actual discharge, and the actual discharge here was from VSP, you say, whoa, what's that got to do with the rest? I think the way you're doing it is by saying where B says review the claim, and the claim from H1 carries with it the full scope of what you're talking about. I think that's probably.  So that's true. And yes, I agree with that. In addition. I mean, can you, am I nuts? Or can you appreciate me and being very particular plain meaning analysis to fit your case into B? I appreciate that. Because it's looking at the actual circumstances, the actual kind of discharge you've got. And you want to bring in the full scope of your H1 claim. Right? Yes. I think the one, I agree. The one other thing I would add, I take your point that it's not crystal clear, but when you look at it in context, when it's talking about a discharge, it's talking about a discharge record because this is all being directed to the record board. So that's the only caveat I would answer, I would add. But I agree with where we've sort of come out on that. Counselor, can you answer something even more basic that I need to get clear? And that, what is the liberal consideration? So, Dwayne, this court said that 1552H codified these prior memos. So there's the Curta memo and the Hagel memo before it. And that it provides a more lenient evidentiary standard. So that. Is it clarified or is it just actually incorporated? It says codified.    Dwayne. What did we mean by that? Well, so I think what you would do then is we're trying to understand, you have an evidentiary standard that is admittedly, whenever you have a new standard, it's always going to be a little bit abstract until it gets filled in with case law and individual decisions. But here, what we have is some guidance because it was based off of this memo, the Curta memo, which gave, which by the way, is still independently binding. But to the other side, the Curta memo gave specific examples about how to apply liberal consideration. So when you're interpreting. Back up for a second. When you say independently binding. So even if I were to determine on a sort of a clubbing or a very narrow minded reading of D that you don't get. It'll see under B. Because you're only focusing on BSP. That's irrelevant. You're still going to get it because of the incorporation. Yes, but also just not even, we don't even need 1552. So, so the boards. The government can clarify this, but the boards are independently obligated to follow Curta.  Right. And they've said, well, aren't they obligated to follow that as well? The government concedes that's not applicable here because of the timing, the timing of that decision was released after, after this. So the government does not argue that that memo is binding in this case. And just assuming I understand. Again, that's not applicable to this case, but we're looking at the broader picture of all this. So the, aren't the boards obligated both to follow Curta and Vazirani and how can they do that? The courts of claims that have looked at this question have said that Vazirani is inconsistent with doing that, that memo, which is trying to say that liberal consideration. Yeah, it applies to the narrative reason, but they're saying, it bifurcates and the white decision actually, which was submitted yesterday, it goes into this and explains it as well. Doyin said that liberal consideration necessarily applies to the underlying factual determinations to correct or maintain the narrative reason. I apologize to the presiding judge. My question deviated away from where the presiding judge was pushing you, which is to try to say, can you really tell us exactly what. Correct. We've been talking about what triggers liberal consideration and I'd like for you to answer, what is it? How do you define it? And I'm going to ask your friends on the other side, the same question. So as I said, Doyin said it's a more lenient evidentiary standard, but there's also in Curta specific guidance on how to apply liberal consideration. So for instance, it in paragraph four says that the board must consider evidence from these outside sources. Or you try to walk it paragraph by paragraph through the Curta memo. Can you just summarize, can you attempt to summarize in a single sentence? What does it mean to give liberal consideration? Liberal consideration requires giving a more lenient review of the evidence. What does that mean? How much more lenient? I might need more than a sentence. That's what we're asking for some specificity if you can guide us. I mean, you don't, your brief doesn't adopt Goosey, the opinion in the ninth circuit has a line in it. So you don't. So we submitted that as a 28-J letter because it came in after our briefs. We agree with the Bussey decision authored by Judge Wallach. There it said that it requires resolving doubts in favor of the veteran. Right. But that's inconsistent with Curta because Curta says that the LC doesn't, doesn't make you win. Well, but Bussey doesn't say it makes you win. It said that it requires you to. Solve the doubt in favor of the veteran. So the veteran comes in and says my PTSD affected my performance. And if there's doubt, then the veteran wins. Well, if there's contrary evidence in the record that discredits the, I mean, it doesn't, I don't, I don't read Bussey to say that veterans test. You don't, you don't have a formula, for example. I mean, we know what preponderance is. We know what, you know, clear and convincing evidence is. You, you wouldn't argue that this for example is presumptive correctness. I would not argue that it's no, I would not argue that liberal consideration requires the board to say, no matter what all this other record evidence says, we're going to presumptively assume you have PTSD. So walk us through the facts here with Mr. B and show us where liberal consideration enters the picture of that analysis and how it affects the analysis. Yes. Because you didn't explain any of that in your brief. You just said we're entitled to liberal consideration. Give me liberal consideration, but you didn't give us any guidance on exactly how does that impact your desired fitness determination by the board? We tried to explain it, but apparently let's just go for it. So one example is that in his case, the board discounted Dr. Vogel's diagnosis and his VA disability rating, which for him, he was a hundred percent disabled, 90% for his TB. The board accepted that he has PTSD and TBI, but, but when they looked at Dr. Vogel, his diagnosis and the VA disability rating, it said, it's inherently unreliable and irrelevant. And then what it proceeded to do, which is contrary to paragraph four of the credit memo and liberal consideration is what it did again and again was it used the veteran service record to disprove any outside. Don't tell me what the board did. Tell me how just track the analysis. Just walk us through the analysis here that you want. Okay. So I can see it because right now assume that I can't. Okay. In this case, there's outside evidence from Mr. B, his declaration from his wife with her declaration saying, giving evidence about what was happening to him when he was in the Marine Corps, the board should have, should have taken that evidence very seriously and not discounted it because it wasn't corroborated by the veteran service record. And that's what it did. Time. And again, it, and I won't go down that with the board, but what liberal consideration requires is you can't discard or discredit outside new evidence submitted by a licensed psychiatrist, paragraph nine of Curta submitted by a family member submitted by the veterans statement alone can be sufficient to mitigate the discharge. So those outside sources of evidence, you can't say, well, we don't see that in the veteran service record. Therefore, it must not be true. Okay. Is that it? Well, that's, I think that alone would change the outcome here because that's how the board rejected all of that is no. So, I mean, liberal consideration, the, the, the memo, the current memo has lots of different statutes that potentially contributed to the circumstances resulting in the discharge. It doesn't say caused the circumstances that resulted in the discharge, right? Correct. So potentially contributed to just to me seems give liberal consideration that the PTSD was potentially a factor that led to whatever the circumstances were. Yes. That resulted in the discharge. Yes, I agree. So I mean, in that way, it's, it feels like potentially a lighter touch on the overall fitness determination inquiry, but so when you say potentially contributed to, I don't know how that would mean the application of that's the scope of what it's, what's going to be applying to, but that doesn't tell you the level of, how the standard is will then be applied. Right. And you didn't explain that in your briefing, which is why I'm trying to pull it out of you now, but I get the feeling after an hour, maybe it's not going to happen. Well, I, I'm trying my best. I mean, I think honestly, we cited their specific paragraphs. This is also how the court of claims has implemented it. This is how they've implemented it. They've looked at these paragraphs, paragraphs saying paragraph seven saying the veteran's testimony alone may be  And when the board discredits it because it's inconsistent with the service record, that's not liberal consideration. So what you have to do is actually look at and treat that as legitimate evidence and not discounted solely because you don't see it already in the Is it your view that the board has to, they shall provide a liberal consideration? There's no discretion. Yes. Okay. Great. Okay. We thank you for your argument. We went well over your time. And what I'm going to do is give equal time to the other side and I'm going to restore your three, four minutes rebuttal time that you had initially reserved. Okay. I'll let you from the other side now. Thank you. Counselor Gillingham. Yes, Your Honor. Thank you. I'd love to put in a pitch for jurisdiction, but I know you're focused on office grade rank or rating. I've just become so famous. Pardon me. Can I ask a question about jurisdiction? Oh, I'd love to have a question. Yes. So at the time relevant here, did Sergeant B have the right to self-refer into a MES, MEB, PEB system? So I don't know that. Well, the way this works is. Did he have the right to do it? Yes or no? I don't have a regulation in front of me. I can't say whether it's self-refer. So for example, He cited a regulation saying he did not have the power to self-refer. Probably in the sense that he could not have walked up, knocked on the door to the board and said, I'd like to hold a hearing as a reform. I can fill out. What he would have done pursuant to the medical disability system is gone. His doctors, as he did. You're not answering the question. I mean, other courts have looked at this and have said written and said, no, the service member did not have the right to self-refer. Well, maybe under the regulation that was cited by Sergeant B is the one that says that there's an obligation duty on the military to refer. Right. That's the way the system works. That's right. That's the way the system works. Right. And you should be able to tell me where there is somewhere in these big, great big documents, whether it's in SEC, NAMVIST or in DOD, where there isn't a right to the service member to self-refer. So self-refer. Can't answer that question. I will not give you a document that says a service member can self-refer in the sense that he can insist to the board itself that they hear his opinion. So he can somehow get in there. He can, he can definitely get in there. How can he get in there on his own? Just as he did here. He goes to doctors who looked at him because he was diagnosed with PTSD and TBI upon his return from Afghanistan in 2010. That then kicked off a series of medical meetings, including one. What kicks off a system is whether or not the actual process gets started. Yes, that's right. The argument that's being made, you raised jurisdiction in your red brief. The answer came from Sergeant B that said, Hey, if I don't have a right to self-refer, there's nothing to waive. And so there's real can't bite. And I want your answer to that argument. He does that by saying to his, his military providers who are the gatekeepers to the system that I don't believe I can perform my duties. Instead, he said, I have an excellent overall general feeling. When he says that, does that give him, does that mean that there has to be a MEB opened? Well, first of all, there doesn't have to have been the statute of limitations. You're desperately trying to avoid the question. I'm really not. Jurisdiction hinges on the rights of the court, jurisdiction of the court of federal claims. In order to make real work, there has to be a waiver. Right. There has to be a waiver of a right. Right. So what, what did Sergeant B do here that constituted a waiver? By failing to come to the court of federal claims in within the six years. That's too late. He is too late. No, the, the, the waiver has to happen back at this point in time before there's ever a correction board filing. Right. So by, by failing to bring it to the attention of anybody, really, that he believed he was unfit for duty, which is contrary to the record in this case, he would have triggered that. Now, if he says, I did trigger it because I was saying something contrary to what the record was saying. He triggered a right? He triggered the system, which says when the military provider, a medical doctor determines that his fitness, his medical condition, is questionable. I understand the obligation on the military. Right. When the, when the medical provider has doubt, he pushes into the MEB and that's the first step. I understand that. Right. But the, if we have to write an opinion that responds to B's argument as to why the rheologist doesn't apply because there was no waiver here, you're not giving me an answer yet to the question of whether or not he had a right to put him, get himself into the system. Well, there, there would never be a rail case. That wouldn't trouble. It would trouble you, but so what? No, not necessarily. Well, first of all, courts are courts of limited jurisdiction. They have the responsibility to determine their own jurisdiction. And so when he walked out the door and didn't say do anything to trigger that said nothing in the record to say, I'm disabled, he's no different than the cases that appeared before real or that the real exception applies to and all the real estate. He didn't completely appreciate it. I'm sorry. Maybe it's because he didn't appreciate that he was permanently disabled at the time. And while the record says otherwise, everything he said today is exactly what he could have said within the statute of limitations. I'll pull him out of this, this cycle of combat that he was going through. He was like four tours in Afghanistan, his own, his own superiors pulled him out and told him, take a knee, stop, get out out of this combat situation. We're going to put you something else. Well, his, his, no, his, I'm not sure as to what, but his tour was ending anyway. And so it just so happens that the assignment authorities determined the best use at bottom, a veteran can not self refer to the medical review board. Would you agree with me? If you say self refer, self refer means he's unable to speak to the doctor and say, I want to review. And then they say, yes, you may have. Yeah. He could certainly have said that to a doctor, a doctor under the system that I disagree with him and say, sorry, you can't do it. Okay. Then, then he would have made his, I'm talking about self-referred just on his own two feet to show up and say, I want a review by the medical review. He can do that. By saying it to a doctor, where's the authority on that? Well, this is the way the system works. But first of all, he appears before a medical provider and nature of these diseases. This is not a gunshot wound. The nature of these diseases are internal. He would have to relate. And he did his conditions to a medical provider. And then say, on top of that, I'm not fit to perform my duties. He was saying all of the opposite things. And if they said, if a doctor then said, look, we're not referring you to a medical evaluation board, even though you think you're not fit, which he obviously didn't think is he performs duties for two and a half years. If he had said that, that would have been a denial of a military evaluation board. And that would have been the waiver right there. But just on the record evidence in this case, there's no evidence of him saying to a front door of the MED of the ID ES system, the disability evaluation system. I don't believe I'm fit. I can't do my job. I need to go to a military evaluation board. You need to consider me for promotion for discharge. If he had said all of those things and that was in the record, then maybe that would be grounds for triggering the statute of limitations, but he didn't have any of that. And he didn't say any of that. And so therefore I don't see why we would say that the claims court clearly erred in, in concluding that there was no time bar here. It's the reverse. It's his failure to say that what he's saying now, first he says, well, I got out of the military because according to his complaint, he didn't think he was fit to perform his duties. If that's what he thought, and that's the basis of his case. Now, there's nothing that said he could not have said exactly that to a military provider, but that's not in the record. So his failure to say that, even though he says he knew that all along, that's what his complaint says. Does it, does it matter that what is in the record is that the court of federal claims said that, um, that he did not have knowledge. He could not have had knowledge or perhaps he didn't have knowledge because of his brain injury. Right. So what that was a finding, finding a fact by the court. Well, you said exactly. This court sits exactly as the court of federal claims said, this is a review on a motion for judgment on the administrative records, similar to summary judgment. So you're almost sitting as a court of first review, right? You can look at the same record. And when it comes to jurisdiction, that decision can be made. Um, certainly is made to know what the judge. We looked at whether the court of claims clearly aired, whether this fact finding was clearly erroneous. That's a standard to review. Right. So on the, on the facts, there's no fact, but the judge said was, this was, this is legal reasoning. The judge said, I think I have jurisdiction because I'm not convinced that he had sufficient knowledge as laid out and be in chambers to appreciate the extent of, of his injuries. That's what they said. The standard is not whether the judge is convinced standard, whether the plaintiff has established jurisdiction by a preponderance of the evidence. And he did not. But his reasoning behind that finding of not convinced was because he said it was not until October of 2013 that the veterans administration finally saw and signed off on a document saying, we believe your, your disability is 70%. He, that, that document started with his filling out VA forms. I think it was in February of 2013, two months before he got out of the service answering a questionnaire entitled disability benefits questionnaire. And he answered all the questions he answered that eventually all the facts of the case were then established by his own words. He then sent that on to the VA. Actually, that was conducted by a VA personnel and then eventually got to the doctor in the rating system, which this court is very familiar with. And eventually some doctors said 70% for PTSD, but Mr. Rand, Mr. Sorry, Mr. Sergeant B did not have to know the number associated with his claim. What he had to know was that he had a claim that he could establish in court and he does have a claim and he did establish it in court. He has to have known that his disability was permanent. Right. And he's arguing now that he was doubtful that he knew that was permanent. And then the disability has to be at least 30%. That's to qualify for him. Right. To qualify. But he, he, well, there's nothing in the record that's to this day that says it's permanent. There was a VA rating that says 70% and there's a code. And if you look up the code, it talks about the persistence of his illness, but there's those facts have never changed. He had a viable claim that he could have brought. Now the government may have argued with him about that claim. That's, that's what makes horse races, but he certainly had a viable claim. And it's the exact same claim he brought. The test under Chambers real isn't a viable claim. It's a claim. It's a claim that he, that he would succeed. That's the way I read what the Chambers real is saying. Well, I don't think it's so, I would never put a duty on a soldier to exercise clairvoyance concerning at the end of the day, through all of the boards, all of the courts, all of the appellate reviews and so forth, that the court that the service member would have to know and to be able to take an oath and certify that he knows beyond a reasonable doubt that he will win. He can't know that. I can't know that standing here. He has to be stuck with what the, what the words in these opinions say. Right. It says he has to know that he has a disability. That would entitle him to a disability retirement. Right. But to think the losses, but the word is claim though. It also appears in those things. Well, you've quoted is exactly right. That's what it says, but the courts could not have meant that he had to know he had a winner. He had a viable claim. He had all of the elements of a claim. And he said he submitted that claim. No one's saying this is a violation of rule 11 or where the real exception has been applied to be in instances in which the veteran confessed. He said, I, I honestly believe that I'm disabled. So as to earn a disability requirement. So it was almost like a concession. Right. And that's, that's evidence. That's an easy case. Right. But that's, that's right. And that's evidence. And admission against interest is, but that's in the setting. That's an easy case. All these other cases, there are a number of cases in all the cases in which the exception is not applied. There is some basis for claiming the disability. The veterans aware that he has a PCSD. And he's obviously asking for a disability retirement, which means he's hoping that he can show that he's totally disabled and well beyond 30 in this case. Right. He's hoping. So Jones, for example, he had a rating of 25% this, this court's decision in Jones. He had, the service member there, Jones had a rating of 20% and he said, well, I didn't know I had 30%. So I didn't know I was entitled to it. So I couldn't file a claim. This court disagreed and said, no, you knew you had, you knew the extent of your injuries. You knew you had a claim, whether somebody else agreed, it was 20 or 30 was yet to be determined by the machinations, the machinery of the disability evaluation system and the VA system. I think it would be remarkable for this court. Can you move us to our fitness determination that, that issue? Sure. Pretty much everything that's been talked about here is second guessing of the military. So we have a military board that has made rather specific findings. What are the official duties for Sergeant B? What were they? Do you agree that it comes out of this training manual and it's, it's the various core capabilities that are listed various billets between a 1293 and a 1303. That's the Marine Corps official documentation concerning the sort of, we all agree that you agree with Mr. B that these are the core capabilities Right. And within those capabilities, which the board made specific findings about as to whether he measured up or not. Do we look at the training manual? There's the MOS and then it has the general description. And then it says down below, it says, see the training manual specific details. So that's, so a personnel is someone who has to assign somebody an MOS would look to see, all right, if we're going to put this person, this MOS, they're going to start with basic training and that those regulations you're talking about, what's necessary, what qualifications are necessary for an 0369 MOS. And so just as it would happen in civilian world, I think what judge Ken was asking is, well, where do we look for a document in order? So we can write down a list of what the duties are. So the MOS description that I think Mr. Clement, I don't know the number off the top of my head that he, and I can certainly get it for you that Mr. Clement, I think referred to basically describes the parameters of the MOS. So once you've qualified for that MOS, you are assigned that MOS and then throughout your career, you sort of carry that with you, but there's a wide variety of duties that can take place within that. And those are all specified out in the training manual. The training manual sets them out. Right. So we look to the training manual to find duties. So. Yeah. So the point the colonel is making is that not everything can be put in writing. So for example, if you look at fitness reports. What does that mean? Well, there are parameters set out for what qualifies you and the military made the decision he was qualified. Nobody has ever said in this case that he has ever not been qualified. All the things he has done. First of all, the assignment of an MOS to him. We're just trying to figure out right now if the board did enough to compare his condition to the actual duties that were part of his official rank and rating. And so right now you're telling me, yes, we can look at all these different core capabilities that are listed in these various billets between A1293 and A1303. And then when we look at those lists of core capabilities, some of them include things like locate, close with and destroy the enemy by fire and maneuver, repel the enemy assault by fire and close combat. So we don't see anything in the board decision that wrestles with those listed core capabilities, for example. So can we agree with that premise that the board didn't address those particular itemized core capabilities? I think they fully analyze it the way they are. What page would I be able to find that? You would look at pages and I can read these to you. Now what you will not find. I would like to see it in the board decision. Yes, okay. So look at, for example, pages... It's where the board describes pages 4259. 4259, right? Yeah. 4256, I should say. 4256. 4256? I'll need a quote. We're on 4256. There's a lot of words on these pages. I mean, this is the premise of their entire Kelly argument that there was never an apples-to-apples analysis here. And that premise we reject. The idea that... So that means you know where it is here in the board decision. Well... On 4256, for example, the page you mentioned, could you tell me which words you're talking about? There are more and they come later in the decision. I agree with you on 4259, but I don't... My notes say it says, we believe you could have continued to serve... We're not dealing here with beliefs. We're dealing with facts. So point to me... This is a belief of the military concerning his... Where are you on the page? What page are you on? So I started on 4256. I just randomly made a note that there was a statement there in the board's decision that the board believed he could have continued to serve successfully.  The second full paragraph? Yes, I know. I'm sorry I did not highlight that. I have the others highlighted. So in the second full paragraph... The second full paragraph. The finally paragraph? Finally, yes. Which one? You, what stands out to you, maybe in the middle, you'll see your Marine Corps... Which line? Count the lines. One, two, three, four, five, six, seven. Begins on seven. One, two, three, four, five, six, seven. So your Marine Corps career? That's the one, Your Honor, yes. Ended because you were elected in VSP, not based on any limitations imposed. I'm sorry, it's the next one. No, I'm sorry, it's the next one, Your Honor. It's the next one after that, begins the word based. Based on your record? Yeah. You were operating successful? Over an extended period, no medical limitations. The board believed that you could have continued serving successfully if you had chosen to enlist. That's the military saying you would have continued to perform serving. Yeah, but in terms of a specific analysis... Right. These core capabilities that I quoted, one is locate, close with, and destroy the enemy by fire and maneuver. The other one is repel the enemy, assault by fire, and close combat. Yeah, you will... The question is, these are itemized core capabilities, and to what extent did the board analyze, in light of the fact that he had an established diagnosis of PTSD and TBI, he, at the time of his discharge, was capable of locating, closing with, and destroying the enemy by fire and maneuver, and repelling the enemy, assault by fire, and close combat? Well, you won't find those words. As the trial judge said in Kelly, there's no statement in the regulations that require that kind of, that level of detail. For example, the regulations, the DOD regulations... Well, what did we ask for in Kelly? Didn't we essentially ask for some kind of task by task? No. And the regulations, what you just said, would have had to have been based on the regulations? Sir, can't you identify for us, in the board's opinion, where they actually did an analysis of reasonable ability to perform your assigned duties? So, you mentioned 4259. Right. So, for example, if you look at 4259... Yeah, I'm looking at it. What they do is they say, in the last four reps when you were over to the Navy doctors and nurses out of garrison, here are the... Here's what your duties were according to your fit rep. Right. And so they say, okay, you were doing all those very, very well. So then they say, we're going to look at what your duties would have been if you'd been assigned in garrison, right? And they are able to go through the MOS and through even the training manual. And out of the training manual, they pick out a handful of obligations, and they say those obligations are overlapped with what you're doing over with the Navy doctors and nurses. And because you were fit there, you're going to be fit there, so there's the answer. I believe that is the core of the analysis of the issue. Would you agree with me? More or less. The core of the analysis is contained on those pages. You can't point anyplace else in the opinion where there's a similar analysis. I was trying to make sure we were looking at the same thing. I'll take this whole page and put it in our column. This is the analysis that you were defending here as sufficient on the question of fitness. On pages 4259, 4260. Basically, you can read yourself. You understand what I'm... Let's not play games here. No, I understand. You understand what I'm saying. So that is the question. So I think the argument that's coming at you from the bench is fine. There was an overlap. And the duties that Sergeant B was performing with the Navy doctors and nurses, he did beautifully on that, and we'll agree with you. If he'd been back in Garrison, the only difference would have been different students and the CO would have had a different uniform. But Sergeant B is saying that's not the question. The question is whether those limited duties in the two settings is the correct assessment of the range of his normal duties. So what's really underlying all this is the idea that there has to be a list, one through 56, of every task or skill. I don't think that... That's the task by task, right? That's a major characterization of what Sergeant B is asking for. I think what Sergeant B is asking for is to say, you can't just assume that when you have a limited category of duties, that that's the only duties to which your office in rank assigns you. Right. Because there's an obligation on the board to look beyond the subset because I think you've agreed in your answers to Judge Chen that Sergeant B's range of duties was broader than footnote 31. You've agreed with that? Yes. So when you agree with that, the question is doesn't the board have to then look at at least some of the other duties that are core? Well, they did. So for example, and I think...  No, but there's... First of all, there's no question that he was capable of these things in the sense that he had done them before. So he has muscle memory. He has experience. There's nothing in the record the board found that suggested that he had lost any of those. And in fact, not only was he doing these, the court gave examples. So they basically said, here's how they sort of covered the waterfront on this without going one through 56 in my example, by saying that the duties you're performing are consistent with the duties of an Infantry Unit Leader MOS 0369. So if you're responsible for duties one through 56 and maybe in one assignment you're doing one through 13, another you're doing 14 through 26, it depends. Are you in an S3 shop, an operations shop, where you're planning combat? Are you on the front lines? Are you training soldiers to go to combat? Their argument basically is that so long as a service member is capable of performing any of his duties, then he's fit, does not unfit. There's no suggestion that he was not unfit. The only way that I think Sergeant B would be satisfied is if they sent him to some sort of certification, sent him to Fort Riley, Kansas or Fort Bragg or something and said, we're going to run you through 10 days of simulated combat, and we're going to see if you can do land navigation and so forth. However, I also want to call the court's attention to the fitness reports that the board clearly did review, and those are at pages 4896, 4901, and four... Those are the four while he was in the Navy? Right. Yes, 4896, 4901, and 4891. And there they list more. They talk about, for example, close combat. I'll turn to the page rather than guessing. Can I just ask a question? There's a lot more infantry-type stuff, tactics. Just a question related to combat deployability. My understanding of your response to the four veterans in Ecospring is that you agree that, as a general proposition, stateside training for combat is relevant. It's very important, because that's where most service members are right now and hopefully for the foreseeable future. Did you think that in Sergeant B's ranking and rating that one of his duties is to be able to engage in stateside combat training? He was delivering combat training. Excuse me? He was delivering combat training, so I just refer to those pages 4896... Well, I don't know what delivering training means. I mean, I would think that what the four veterans are talking about is participating in training, you know, going out on whatever military camp, Pickle Meadows, if it's winter training. You may know the adage that the best way to learn is to teach. So, for example, if you look at page 4896, for example, they identify the sort of accomplishments he did, which are all of the sort of things you're talking about. So the first one at 4896, and this is in... Just to be a little bit clearer, you're pointing this now to, like, the billet description and things like it, right? No. On the reverse, are these duties that a soldier would undertake on the combat field? Many are in terms of coordinating, providing guidance, things of that nature. As an E6, you're sort of a higher level, you're approaching management level, so he's doing more soft skills. But, Your Honor, what I was referring to is the last... As an infantry troop leader. Oh, sure. I mean, sergeants are not the same as privates, for sure. And, for example, so one of the things here that talks about provides guidance and instruction on military matters, there's something in the military known as shade tree classes or shade tree instruction, where when you have a break in the action or you're back in the rear or whatever, you can actually exercise or continue to train or hone your military skills. Not everybody's fighting at all times. But, Your Honor, what I was referring to on page 4896 and the other sites I've referred to is block C of this fitness report called billet accomplishments. So, for example, the board says, the supervisor, the raider says here, assisted in the development and refinement of the battalion's culminating field exercise resulting in more realistic and current tactics, techniques, and procedures used in the fleet marine force. You're reading it from 48, how do you say it? 4896, Your Honor, it's that bottom block. So, in your view, is there any difference between simulation combat and real combat? Well, yeah, you can get killed in real combat. In fact, Sergeant B's superiors pulled him out of actual combat, right? And said, you've had enough, buddy, take a knee. Well, he was given a three-year assignment to train, which is the court found and as... But his supervisors acknowledged or saw in him a brave, courageous, well-worn soldier. He's a hero. Yeah, and it was time for him to step down, take a knee, do something else. That would be true of anybody. I mean, there's... First of all, it's not enough... That's correct, right? There is a statement in the record where somebody said, take a knee, which is a colorful phrase, but what we're dealing with is nothing more than routine assignment philosophy. He had four assignments back to back to back to back. That's unbelievable, number one. To have a fifth, even if he sort of got through his last game... It's quite incredible that he's... Anyway, so... He was a hero. Yeah, no question about it. And he was told, come home, you've done enough for the country, on combat duty anyway, we're gonna have you do something else where you don't get killed or further injured or hurt. Well, that was the natural consequence of his assignment, but that's the way assignments work, as Judge Clevenger pointed out.  There's a long tooth to tail ratio. Was there still an accomplishment pointed out by the board? I don't know that they quoted it, but they may have quoted it in part, but they certainly said they reviewed it. This was a large part of their basis, and they can presume to have read it when they talk about it. So, also it says, led and mentored trained over 268 students in combat leadership, offensive and defensive operations... No, I understand. You're reading from something that the board didn't specifically say, so I understand. Right, but this court has long held that whether you're reviewing a decision of a trial judge or of a board... It's a liberal consideration. Pardon me? Liberal consideration. Could you speak about... Can I talk about liberal consideration? Sure. What is it? First, define it for me. It's defined. It won't be defined to Judge Chin's satisfaction, but he has to take it up with either the Congress or with Mr. Curta. Well, define it to my satisfaction, then define it to his, and we'll see what the difference is. Okay. So, here's the Curta memo, and as Mr. Clement said, it's hard to summarize in a sentence because it's got all these words in it, and it basically breaks down what liberal consideration means without defining the term per se. So, it's not defined any better than... Well, when we talk about preponderance of the evidence, for example, we talk about 5149. There's no clear definition. Yeah, there you go. Exactly. And there's no clear definition of maybe even beyond a reasonable doubt or clear and convincing. Could it be as simple as, well, the fact finder should somehow give more weight than it ordinarily would to evidence that supports a PTSD diagnosis and also evidence that supports that PTSD potentially contributed to whatever the circumstances were that led to the discharge? I think it's more of what Mr. Hagel did, what Mr. Curta did, what Mr. Wilkie said, is to say to people who make decisions, you need to be aware that we are in a different world. The Hagel memo in 2014 began with the concern that PTSD did not exist for military veterans. They had no way to articulate what happened to them. They had no medical documentation in particular. What they might have had is a buddy statement that can describe conditions. They could have the service members on, and they would say... Did you get to the answer? We understand. We read the memos. What is your analysis? I gave you one proposed theory of what liberal consideration could mean in the context of 52H. What's yours? Liberal consideration says you have to be sensitive to the fact that there's a lack of proof coming from traditional medical sources, so you have to be aware of the fact and pay attention to the fact that a service member may only have his own words, and those words are not to be discounted because they are just his own words. They are to be considered as potentially establishing but not necessarily proving that a condition exists. In the recent white opinion from the claims court, the claims court there expressed something like, we should give less scrutiny or more moderate scrutiny to evidence and testimony that someone has PTSD. In order to establish such a PTSD diagnosis, do you recall this from the opinion? I don't recall the exact words, but I would not say it that way. I would simply say what I just said, that a service member's testimony, what it means is, you asked me what liberal consideration means to me, my interpretation, is that a service member's testimony cannot be discounted solely because he is a layman, solely because it's coming from him alone, and he doesn't have traditional sources. Testimony of the veteran's wife or friends or service members, all that should be considered. 100%. But it wasn't in this case. It was. So what it goes to, one of the things that Curtis talks about is that liberal consideration might help, these things are all in the conditional, may establish that he had such a condition, even without a doctor's note. In this case, the board accepted, so there's no error there, accepted that he had TBS. I'm sorry. Bussey versus Driscoll. Right. That's a case from this 9th Circuit. Right. Judge Wallach, sitting on the 9th Circuit, addressed the issue, the definition of liberal consideration. He said,  liberal consideration is a lenient evidentiary standard that is not strict or literal for reviewing the veteran's claim that PTSD potentially contributed to the circumstances resulting in a discharge. I think that is an accurate quote or a paraphrase. I'm not sure the lenient gets you any farther than liberal, but yes. And again, the purpose of all of these- I pretty much agree with that. Pretty much agree with that, yes.  To the extent that- You agree with what the opinion said the consequences were? Basically, that in dispute, the benefit of the doubt goes to the veteran? No. There's no benefit to the doubt rule here. It doesn't go any further. Do you agree that that's what Bussey is saying? I think that's what he said, and we disagree with that. So there's, yeah, there's nothing in CURTA that says that, and there's nothing in the statute, plain words or otherwise, that says that. If we were to conclude that whatever it is, it's less than what Bussey says is we'd create a conflict in the circuits? I don't know that- I suppose if you're- Well, what's at issue there, and why that- The argument here is that I think,  what the veteran is trying to argue is that he thinks Bussey's correct. So he thinks- So the question here,  is whether this applies to fitness. Was it issued in Bussey? No, what was issued there, why he agrees with it, is not- I don't think there's any big debate about what liberal consideration is, because it's defined in the CURTA memo. Those are plain words. I'm not going to put a gloss on them. Whatever it is, we've now been talking for a while, and our minds and your minds haven't been able to come up with an expression of what it is, the way you can describe what current convincing evidence is, or what substantial evidence is. You have a broader argument here, which is that, whatever liberal consideration is, it doesn't apply. Right. And then, that argument has to be in two pieces. It doesn't apply under the statute, or doesn't apply under CURTA, because you agree that CURTA binds the boards independent of the statute. Yes. So, what is your argument as to why liberal consideration doesn't apply to this case under the statute? I think Judge Bonilla's contribution to the jurisprudence in this area was to adopt sort of a- Well, first, why don't you look at your brief and tell us what you told us, why it didn't apply. What we said was there were two different regimens. Well, you looked- Your brief didn't look at- looked at section H1, correct? Are you talking about a current- Well, you have to agree that your brief is a little thin in response to the question that starts on page 40, thin on why it is as a matter of statutory interpretation. There's no LC. And if I'm not mistaken, your entire argument on the statute is on page 47 in one sentence. Unlike the request Joanne decided, Mr. Bees is not a request quote, for review of a discharge or dismissal. I'm just trying to think. Did you write the brief? Did you sign the brief? I'm not mistaken. What I just quoted on line 47 refers to paragraph H1 of 1552. I think that's right. You have the statute with you? I have it on the phone. It's right up here. Okay, Your Honor. I'm looking at H1. And I'm looking at H1. I do, but I don't know. Yes, and so I'm reading H1. And so your question about H1 and that. Okay. So you see where you're saying there that's a different case is this you're not asking for review of the discharge or dismissal? And can you tell me what Sergeant B's response to that argument was? So you're asking about page 47 of our brief? 47, yeah. I'm trying to find. Okay. There was an argument being made by Sergeant B that plain meaning of 1552, you know, he says they get liberal consideration. And this is your statutory construction argument here. So I think what we were saying there harkens back to an earlier. Did you read his criticism? I'm sorry? Sergeant B filed a response to your reply. And he said you're basically reading out of H1 the word claim because his review is for a claim or review, not just reviewing the discharge. Right. And so I understand that that's his claim and that's exactly what the statute says. I'm not saying he's not made a claim. What I'm saying is liberal consideration does not apply to the military disability evaluation system. That does not speak at all to that system. Why not? If you read H1 broadly, right, is the claim, okay, for review based wholly in part on anything having to do with PTSD? Right. So what we've said about that is there are two separate systems. One of the points Judge Bonita made in white was that this is operating within the lane. I'm trying to stay with the specific language of the statute. I'm trying to deal with the argument you made here at 47 and then Sergeant B responded to that. And Sergeant B said, well, you've read the key word out of the statute. Right. And you have read the key word out of the statute. The distinction we're trying to make is that a claim for disability is not covered by this statute at all as opposed to a change to the narrative. But why not? Well, if you want to change the narrative reason, like in Doyin, we'd have no argument. I mean, Curtin explained he could do that. He is asking for entry. That's what he's saying here. He's saying we need to change the narrative reason. We need to change the coding. Okay. He could change the narrative reason. If you want to change it from voluntary separation program to disability or whatever the suitable code would be that pertains to the circumstance, that would be one thing. No different than in Levante where Mr. Levante was court-martialed. And in real life, he was court-martialed and sentenced. But this court made a distinction and said his paperwork. I still don't understand why the breadth of his claim isn't fairly embraced as a matter of plain meaning by H1. As a claim, right, for review of a discharge, he's saying I want to review my voluntary out and I want to do it based in whole and part on a matter related to PTSD because I think I should have been found disabled. And that's a different circumstance. But that's his claim. Yeah, I understand that. And that's plain language. And so his claim falls within H1 as plain meaning. He does. Okay, so it falls within. And the most he would get out of that is liberal consideration that he had PTSD and he got it. The board accepted that he had PTSD. But H2B goes further. It says you review the claim with liberal consideration that the PTSD potentially contributed to the circumstances resulting in the discharge. Right. And so, you know, then the next question for circumstances like Mr. B is, was his PTSD a potentially contributing factor that would lead to a medical unfitness? As I understand the BCNR, they do undertake fitness determinations in analyzing whether to do a correction to a military record. They do. That's all that would be happening here. Right. Another fitness determination. And maybe, just maybe, just tracking the statutory language, when it comes to someone with PTSD, when it comes to someone who's saying that the PTSD should have led to a medical retirement, you give a little boost to the analysis as to whether the PTSD potentially contributed to supporting a medical unfitness finding. So we don't think that any of this applies. I understand the plaintiff's argument. I'm not fighting on that at all. What I'm saying is, as Judge Bonilla pointed out in white, under the so-called old soil document, this exists within the lane created by DOD. That began with Mr. Hagel saying, service members have a hard time establishing why they did what they did, and their paperwork indicates bad conduct, discharge, unauthorized. He specifically spoke about it. If I could just quickly translate to cut this short. Your view is, whatever these words are on the statute, just go look at Hagel and Curta and restrict yourself to what Hagel and Curta speak to and neither Hagel nor Curta speak to medical retirement. That's right. Okay, so that's your argument in response to the statutory question. Yes, and in addition, this statute, which was within the lanes of Hagel and Curta, it codified it, never said, and Hagel and Curta never said, and Vazirani says they never said, but this was aimed at fitness determinations. The fitness determinations are part of an entirely different regimen under 10 USC 1201, where the benefit of the doubt, the presumption of fitness is involved, where the preponderance of the evidence has to show the service member was not fit and so forth. So if all he wanted was to change the narrative reason and it just sat there as a paper entry like in Labonte, I suppose he could have that. But ultimately, if he wanted to say, now I need to be found unfit, he would have to appear before basically the BCMR or at this point the BCNR, and they would decide, which they pretty much did, fitness, applying the fitness rules. Or did do a fitness determination. They essentially did. In fact, in using the term preponderance of the evidence, they were echoing the requirements of that system. They seem to do fitness determinations regularly. I'm sorry, your honor? They seem to do fitness determinations regularly. They do do fitness determinations, and what they're saying is, and what the Vazirani memo says is, when you're sitting as a fitness board, because members have already left, they don't have access to a PEB and so forth, then you're going to apply the rules that pertain to how we determine fitness. Those are determined by the statute, 1201, and by the secretarial regulations underneath that. That includes the presumption of fitness and all the other things. That's one system. Congress never spoke to that system in the entirely different circumstance of correcting a DD-214. I have paperwork saying one thing. I think we've had your argument, and we thank you for that. Thank you, your honor. I appreciate the attention you've spoken to. You've spent on this. The reality is, we could sit here all day discussing this case. I could, for sure, and I know you don't want to. All right. Let's hear from Mr. Clemente, and you had three minutes of rebuttal time. You know, you could take a little bit more if you need it, but you're on for three minutes, okay? Thanks, your honor. On liberal consideration, just to be clear, when Mr. B took the voluntary separation, he did that because of his disabilities, because of his PTSD and TBI. And so we think that this can be talked about this in... Where is that in the record? Where is what? You're saying that the reason why he went to VSP was because of his PTSD? Well, we have in the record his statements of struggling with his TBI and his PTSD in his declaration and those same statements from his wife. I don't believe off the top of my head that we have a statement saying, I did VSP... Not by him. You have it in your briefs, two points in your brief below. You'd make that argument. Well, right. And I think that that's what the evidence in the record supports. That conclusion. And so as far as 1552H is concerned, these would be the circumstances that contributed to the discharge, would be his traumatic brain injury and his PTSD. In terms of... And this will be my shot at answering the liberal consideration standard. I guess I would just say when these standards are filled in, normally this is just... It happens with the accretion of case law and those facts then give shape to a broader standard. But I think here, I would say at least two main things. One, you need to say that you're applying liberal consideration. The board needs to say that and show how it's impacting its analysis throughout. Here, it didn't do that. Two, the board should start with the presumption that the evidence submitted by the veteran from outside the service record is legitimate evidence. It shouldn't... Like, on par with the service record evidence. It doesn't mean that that evidence is going to be dispositive. It doesn't mean it has to win the day. But you can't take all of this evidence submitted by a veteran based on a licensed psychiatrist, based on his testimony, his wife, all this evidence, the VA ratings, you can't dismiss that and say, well, we don't see it in the service record, therefore it's not reliable. So I think at minimum, at a high level, that's what's required in liberal consideration. So giving that outside evidence, outside the service record, legitimate weight doesn't mean it has to win the day, but you can't dismiss it because you don't see it in the service record. Well, it is subject to being discounted, rejected, for sufficient valid reason.  On fitness, I think that, as I understand it, the government has basically agreed that these are the duties that are the correct duties, and we think that that is essentially despised. I'll just remind the court, we also think, under Kelly, the failure to consider the relevant criteria, deployability, and common military tasks as an additional basis to vacate and remand. Finally, on jurisdiction, just very briefly, you can't self-refer, that's Kelly at 890. Also, the trial court findings were much more extensive, and they all reviewed for clear error, as you said, Judge Rayna. This is Appendix 6 to 7, and that's where the trial court didn't say... What's your response to the government's argument on the right to self-refer? As you can tell, I wasn't getting as sharp an answer as I wanted. I realize it may be a more separate concept than I appreciate as a non-military person. Actually, there had been... Sergeant B. did have a right to get into the system by going to the doctor and saying, look, I'm in very bad shape, and you need to pay attention to me. Kelly at page 890 says, a service member cannot self-refer to the disability evaluation system. Kelly says this on page 890. We said the regs as well in our brief. It doesn't set out who can make the referral for a veteran like the superior officer? Yeah, there's specific people identified who can do that.  Well, if that's the case, then we might as well just take real and so long until the military changes its rules, and throw real in the trash can. Well, that's why I think in the 20 years since Chambers was decided, there have been only three cases ever finding the real exception satisfied, one of which was overturned. That was Reeves. And the other two, as Your Honor mentioned, there were express disability waivers. That's Woods and Pohl. And here, the waiver of the entitlement to disability benefits, and there's nothing of the sort here. We thank you for your argument. We thank all the parties for your patience in your argument. It was very well done. And this court now stands at recess. If I was a little sharp with either one of you, I apologize for that, but I hope you can appreciate that what we are trying to do is to be as precise as we can. So we are trying to turn the square corners that our honorable members in the military do. And sometimes it's a little frustrating. I realize that you all are doing your best. Thank you. Same here. Thank you.